**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

LEADING EDGE DEVELOPMENTAL
SERVICES,

         Plaintiff,

vs.

ENXCO INC.,

         Defendant.

No. C05-3047-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING CROSS
MOTIONS FOR SUMMARY
JUDGMENT**

_____

**TABLE OF CONTENTS**

*I. INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   *A. Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . . . . . . . 11
   *B. Choice Of Law Determination* . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   *C. Analysis Of enXco's Motion For Summary Judgment* . . . . . . . . . . . . 14
      *1. Elements of breach of contract claim* . . . . . . . . . . . . . . . . . 14
      *2. Applicable contract law* . . . . . . . . . . . . . . . . . . . . . . . . . 15
      *3. Interpretation of the terms of the CSA* . . . . . . . . . . . . . . . 17
      *4. Mutual mistake* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# I. INTRODUCTION AND BACKGROUND

## A. Procedural Background

On June 27, 2005, plaintiff Leading Edge Developmental Services ("Leading Edge") filed its petition in Iowa District Court for Hamilton County against defendant enXco, Inc. ("enXco") asserting a single claim for breach of contract. This lawsuit is centered on whether Leading Edge is entitled to an abatement success fee under a contract between Leading Edge and enXco. On July 27, 2005, defendant enXco removed this case to federal court. Defendant enXco subsequently moved for summary judgment on the breach of contract claim. Defendant enXco asserts that it is entitled to summary judgment on plaintiff Leading Edge's breach of contract claim because Leading Edge had failed to refund certain monies paid to it by enXco, the refund of which was a condition precedent to Leading Edge qualifying for the abatement success fee. Plaintiff Leading Edge has filed a resistance to enXco's motion and has also moved for summary judgment on its breach of contract claim. Leading Edge asserts, *inter alia*, that it ultimately tendered the refund but that enXco refused to accept it. Defendant enXco has in turn moved to strike plaintiff Leading Edge's motion for summary judgment, arguing that Leading Edge did not file it within the time allowed by the court's Scheduling Order and Discovery Plan. In the alternative, defendant enXco has resisted plaintiff Leading Edge's motion for summary judgment. Although Leading Edge's motion for summary judgment was clearly filed after the deadline for filing dispositive motions in this case and without leave of the court to file its motion after the expiration of the dispositive motion deadline in this case, the court notes that plaintiff Leading Edge's motion for summary judgment traverses the same material and issues as defendant enXco's motion for summary judgment. Therefore, the court denies defendant enXco's motion to strike.

The court turns first to a discussion of the undisputed facts as shown by the record,

then to the standards applicable to motions for summary judgment and, finally, to the legal analysis of the merits of the parties' respective motions for summary judgment.

## B. Factual Background

The summary judgment record reveals that the following facts are undisputed. Plaintiff Leading Edge Developmental Services is an Iowa corporation that provides construction planning, project management and economic development consulting services. Defendant enXco, Inc. is a Delaware corporation that develops, builds, operates and manages wind energy projects throughout North America.

Between 2001 and 2005, enXco contracted for the services of Leading Edge in the development of wind farm projects. On August 14, 2001, Leading Edge and enXco entered into a Project Management and Marketing Agreement ("PMMA"). Pursuant to the terms of the PMMA, enXco utilized the services of Leading Edge to assist it with the development of wind farm projects in a specific territory in Iowa. This territory included, but was not limited to, the "Wall Lake Counties" in Iowa. Leading Edge provided assistance to enXco in connection with the development of a wind farm project ("the Wall Lake Wind Farm Project") in Iowa in Wright and Hamilton Counties.

Leading Edge was retained by enXco to assist it with "Governmental/Regulatory/Permitting Interface." PMMA at 1, Defendant's App. at 1. Services rendered by Leading Edge in this capacity included meeting with certain members of the Wright and Hamilton County Board of Supervisors. The individual from Leading Edge who initiated and maintained these contacts was Dave Brunsvold. One purpose of Brunsvold's contacts was to advocate, on behalf of enXco, that the county supervisors pass ordinances in their respective counties that were modeled after Iowa Code § 427B.26. Iowa

Code § 427B.26 sets forth a special tax valuation of wind energy conversion property.[1]

[1] Iowa Code § 427B.26, which is entitled "Special valuation of wind energy conversion property", provides:

> 1. a. A city council or county board of supervisors may provide by ordinance for the special valuation of wind energy conversion property as provided in subsection 2. The ordinance may be enacted not less than thirty days after a public hearing on the ordinance is held. Notice of the hearing shall be published in accordance with section 331.305 in the case of a county, or section 362.3 in the case of a city. The ordinance shall only apply to property first assessed on or after the effective date of the ordinance.
>
> b. If in the opinion of the city council or the county board of supervisors continuation of the special valuation provided under this section ceases to be of benefit to the city or county, the city council or the county board of supervisors may repeal the ordinance authorized by this subsection. Property specially valued under this section prior to repeal of the ordinance shall continue to be valued under this section until the end of the nineteenth assessment year following the assessment year in which the property was first assessed.
>
> 2. In lieu of the valuation and assessment provisions in section 441.21, subsection 8, paragraphs "b" and "c", and sections 428.24 to 428.29, wind energy conversion property which is first assessed for property taxation on or after January 1, 1994, and on or after the effective date of the ordinance enacted pursuant to subsection 1, shall be valued by the local assessor for property tax purposes as follows:
>
> a. For the first assessment year, at zero percent of the net acquisition cost.
>
> b. For the second through sixth assessment years, at a percent of the net acquisition cost which rate increases by five percentage points each assessment year.
>
> c. For the seventh and succeeding assessment years, at

(continued...)

The passage in Wright County and Hamilton County of ordinances based upon the language of Iowa Code § 427B.26 would result in the realization of a tax savings by an owner of real property dedicated to wind energy conservation. No one on behalf of enXco, or any other company, had any contact with Wright County officials regarding wind farm tax abatements.

On December 10, 2001, the Wright County Board of Supervisors passed Wright County Ordinance No. 2001-26, which is entitled "Assessment of Wind Energy Conservation Property." On December 20, 2001, the Hamilton County Board of Supervisors passed Hamilton County Ordinance No. 2000-3, which is also entitled "Assessment of Wind Energy Conservation Property." Both of these ordinances provided for a special valuation of wind energy conservation property and were modeled after Iowa

[1](...continued)
> thirty percent of the net acquisition cost.
> 3. The taxpayer shall file with the local assessor by February 1 of the assessment year in which the wind energy conversion property is first assessed for property tax purposes, a declaration of intent to have the property assessed at the value determined under this section in lieu of the valuation and assessment provisions in section 441.21, subsection 8, paragraphs "b" and "c", and sections 428.24 to 428.29.
> 4. For purposes of this section:
> a. "Net acquisition cost" means the acquired cost of the property including all foundations and installation cost less any excess cost adjustment.
> b. "Wind energy conversion property" means the entire wind plant including, but not limited to, a wind charger, windmill, wind turbine, tower and electrical equipment, pad mount transformers, power lines, and substation.

IOWA CODE § 427B.26.

Code § 427B.26.

Sections 2 and 3 of the PMMA provided the method by which enXco would compensate Leading Edge for the work performed by Brunsvold on the Wall Lake Wind Farm Project, including any efforts directed toward the passage of the wind energy conservation valuation ordinances in Wright County and Hamilton County. Leading Edge was compensated by enXco on a time and expense basis for this work. Pursuant to the terms of the PMMA, enXco paid to Leading Edge all amounts due in connection with Brunsvold's work directed toward the passage of the tax abatement ordinances in Wright County and Hamilton County. All of this work was completed by Brunsvold prior to May 28, 2002.[2] The PMMA contained no specific reference to commissions for the abatement or refund of taxes from government entities. Discussions between Leading Edge and enXco regarding a commission or "success fee" for tax abatements were ongoing beginning in November of 2001.

The term of the PMMA was August 15, 2001 to August 14, 2003. Prior to its expiration, Leading Edge and enXco executed a Consulting Services Agreement ("CSA") that superceded and replaced the PMMA. On May 28, 2002, Alan Johnson, on behalf of Leading Edge, signed the CSA. On June 3, 2002, Joe Fahrendorf, on behalf of enXco, signed the CSA. The term of the CSA was twenty-four months from the date of execution.

The parties exchanged several drafts of the CSA before the execution of the final version. Both Leading Edge and enXco had input into the language ultimately selected for use in the CSA. The contract that would become the CSA was first drafted by enXco. Drafts of the CSA included a commission or success fee for tax abatements on all wind

_____

[2]enXco contends that the total sum paid to Leading Edge for the work is $4,108.48 while Leading Edge asserts that the total sum received from enXco for the work is $2,422.16.

farm projects that were constructed. Negotiations as to the calculation of the commission continued though the winter of 2001-2002. Internal emails of enXco reveal that payment of success fee to Leading Edge would be contingent on financial closing or "getting the deal done." A "credit" regarding the Wall Lake Wind Farm Project was discussed by the parties during their negotiations over the language of the CSA.

Section 3 of the CSA, entitled "PRICE AND PAYMENT", provides:

> A monthly retainer of $2,400.00 shall be paid on commencement of this agreement and each month there after to apply to all work each month up to a maximum of 40 hours work per month by senior LEADING EDGE staff. Hours of work more than 40 will be billed at the rate of $50.00 per hour. Travel time to be accounted for at a rate of 30 minutes work per 1-hour travel) [sic]. No travel time will be counted for any one-month if the total of travel time and work totals less than 40 hours for such month.

> LEADING EDGE shall also be paid a "Tax Abatement Commission" of as [sic] listed in Exhibit A for tax savings that result from the work of LEADING EDGE during the term of this agreement for projects that close financing and that have written documentation and assurance of such tax abatement achieved by Leading Edge issued directly to enXco, or its successors, during the Term of this Agreement by the government entities that have jurisdiction over such taxes.

> LEADING EDGE shall qualify for the Success Fee and Tax Abatement Commission for projects that proceed to construction during the term of this agreement or within 36 months of termination of this agreement, provided termination of this agreement was not caused by failure of LEADING EDGE to meet obligations of the agreement.

> All expenses directly related to the provision of services under this Agreement, including but not limited to travel and living,

> will be billed at LEADING EDGE DEVELOPMENT
> SERVICES cost. Reasonable phone, fax, express and mail
> charges to the provisions of services under this Agreement shall
> be considered part of the normal operations of LEADING
> EDGE and shall not be billed. Payment by enXco to
> LEADING EDGE shall be made within thirty (30) days of
> receipt of an invoice from LEADING EDGE DEVELOPMENT
> SERVICES.

CSA at 1, Defendant's App. at 11.

The second paragraph of the PRICE AND PAYMENT section references the payment of a "Tax Abatement Commission" by enXco to Leading Edge upon the satisfaction of certain conditions contained in the CSA. Matters relevant to the calculation and payment of the Tax Abatement Commission are contained in Exhibit A to the CSA which is entitled "Abatement Success Fee." Because all of the tax abatement work performed on the Wall Lake Wind Farm Project was completed prior to the execution of the CSA, and because Leading Edge had already received payment from enXco for this work, a special provision was inserted in the final paragraph of Exhibit A of the CSA. This special provision provided that:

> If LEADING EDGE has completed work on tax abatement in
> Wright and Hamilton Counties, Iowa, prior to the term of this
> agreement, and if LEADING EDGE refunds all compensation
> for that work to enXco prior to June 1, 2002, then enXco will
> agree to include that tax abatement work under this agreement
> pursuant to Section 3.

CSA at 4, Defendant's App. at 14.

Section 4 of the CSA, entitled "TERM", provides:

> This Agreement shall be in effect for a period of twenty-four
> (24) months from the date of execution. The term of this
> Agreement may be extended on a month-by-month basis upon
> the mutual agreement of the Parties thereafter.

CSA at 1, Defendant's App. at 11.

Section 12 of the CSA, entitled "PARTIAL INVALIDITY", states:

> If any term, covenant or condition of this Agreement or application thereof to any person or circumstance shall, to any extent, be declared by a court of competent jurisdiction to be invalid or enforceable, the remainder of the Agreement or application thereof shall not be affected and every term, covenant or condition shall be valid and enforceable to the fullest extent permitted by law.

CSA at 3, Defendant's App. at 13. Section 13 of the CSA, entitled "APPLICABLE LAW", provides: "This Agreement shall be governed and construed in accordance with the laws of the State of California." CSA at 3, Defendant's App. at 13.

Although Leading Edge signed the CSA on May 28, 2002, and enXco signed the CSA on June 3, 2002, the language of the final paragraph of Exhibit A of the CSA required Leading Edge to refund all compensation received by it for work on the tax abatement prior to June 1, 2002. On May 3, 2002, Paul White of enXco sent an email to Alan Johnson at Leading Edge stating that: "Refund of work on tax abatement work for Wright and Hamilton Counties should be made within one month, approximately, of signing this agreement, for Leading Edge to qualify for bonus commissions for that project." White email at 1, Defendant's App. at 166. White included with his May 3, 2002, email a revised version of the CSA. This revised version of the CSA incorporated the majority of the changes to the CSA that had previously been suggested by Johnson, and that accompanied an email Johnson sent to White on March 22, 2002. This revised version of the CSA also added the language "prior to June 1, 2002" to the final paragraph of Exhibit A of the CSA. The language "prior to June 1, 2002" did not appear in the March 22, 2002, version of the final paragraph of Exhibit A of the CSA. The language "prior to June 1, 2002" was added to the CSA by enXco. Johnson has no recollection of receiving from White either the May

3, 2002 email or the revised version of the CSA. The version of the CSA that was ultimately signed by Johnson is identical to the version that accompanied the email sent by White on May 3, 2002, which included the "prior to June 1, 2002" language.

At some point after May 3, 2002, Johnson received the final, revised version of the CSA from enXco. Johnson signed the revised version of the CSA and mailed it to enXco in California sometime during the week of May 6, 2002. At a minimum, several weeks passed between when negotiations over the language of the CSA were completed and the deadline for Leading Edge to refund to enXco the sums paid to it as compensation for work on the tax abatement for the Wall Lake Wind Farm Project.

For some unknown reason, it was necessary for Leading Edge to re-execute the CSA, and to resend it to enXco on May 28, 2002. Leading Edge did not refund to enXco any compensation received for work directed to the achievement of the tax abatements in Wright County and Hamilton County. Leading Edge contends that it was only obligated to "credit" the amount that it had received from enXco against the amount of any abatement success fee at the time the fee became due.

In October, 2003, enXco signed an Acquisition Agreement for the assets and rights for the Wall Lake Wind Farm Project with Mid-American Energy Company ("Mid-American"), with a closing date in June, 2004. Without the tax incentives, Mid-American would not have purchased the Wall Lake Wind Farm Project.

On January 10, 2005, Leading Edge first demanded payment of the abatement success fee through an email from Brunsvold to Ian Krygowski at enXco. On January 14, 2005, Krygowski responded to Brunsvold's email and denied that enXco had any obligation under the CSA to pay the abatement success fee to Leading Edge. Krygowski cited to the language of the final paragraph of Exhibit A to the CSA and the fact that Leading Edge had failed to refund any of the money paid to it by enXco for tax abatement work on the Wall

Lake Wind Farm Project. On January 17, 2005, Brunsvold sent a response to Krygowski's email in which he stated in part:

> I also gave Alan [Johnson] a synopsis of the work performed on the tax abatement agreement with Hamilton and Wright Counties, and what the amount was ($1,387.16) that should have apparently been remitted to enXco to have complied with that sentence in the contract.
>
> Their position at this point is the failure to pay the $1,387.16 may have been an oversight on our part, but that does not alone negate enXco's responsibility to pay the incentive fee for what will be a multi-million dollar benefit to enXco "or its assigns"?

Brunsvold email at 1, Defendant's App. at 178. Brunsvold was an employee of Leading Edge and acting in this capacity at the time he wrote the email on January 17, 2005. Brunsvold was intimately involved in the negotiations leading up to the execution of the CSA, and provided input concerning some of the language that was incorporated into the CSA.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. *Fed. R. Civ. P.* 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the

proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Bunda v. Potter*, 369 F. Supp. 2d 1039, 1046 (N.D. Iowa 2005); *Steck v. Francis*, 365 F. Supp. 2d 951, 959-60 (N.D. Iowa 2005); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 984 (N.D. Iowa 2004); *Nelson v. Long Lines Ltd.*, 335 F. Supp. 2d 944, 954 (N.D. Iowa 2004); *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 981, 988 (N.D. Iowa 2004); *see also Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377. Furthermore, "where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States*

*v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," i.e., are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994). With these standards in mind, the court turns to consideration of the parties' respective motions for summary judgment.

## B.  Choice Of Law Determination

Federal district courts apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Allianz Ins. Co. v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006); *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 895 (8th Cir. 2006); *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 928 (8th Cir. 1999); *Baxter Int'l v. Morris*, 976 F.2d 1189, 1195 (8th Cir. 1992); *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991). Thus, in this case, Iowa's choice-of-law rules govern. Iowa

has adopted the Second Restatement of Conflicts as its choice-of-law provision. *Henriksen v. Younglove Constr.*, 540 N.W.2d 254, 259 (Iowa 1995). The Restatement (Second) of Conflicts § 187 indicates that, with certain exceptions not relevant here, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied." As was noted in the factual background, section 13 of the CSA requires that the CSA "be governed and construed in accordance with the laws of the State of California." CSA at 3, Defendant's App. at 13. Moreover, the parties here do no dispute that this matter is governed by California law. Therefore, the court concludes that the breach of contract claim arising from the CSA shall be governed by California law.

## C. Analysis Of enXco's Motion For Summary Judgment

### 1. Elements of breach of contract claim

Under California law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to plaintiff. *See Reichert v. General Ins. Co.*, 442 P.2d 377, 381 (Cal. 1968); *First Commercial Mortgage Co. v. Reece,* 89 Cal. App. 4th 731, 745 (Cal. Ct. App. 2001); *Harris v. Rudin, Richman & Appel,* 74 Cal. App.4th 299, 307 (Cal. Ct. App. 1999); *Careau & Co. v. Security Pacific Business Credit, Inc.* 222 Cal. App. 3d 1371, 1388 (Cal. Ct. App. 1990); *Otworth v. Southern Pac. Transportation Co.*, 166 Cal. App.3d 452, 459 (Cal. Ct. App. 1985). Here, the existence of a valid contract in the form of the CSA is not in dispute. Instead, the center of the dispute between the parties to this action arises from their conflicting interpretations of the special provision which was inserted in the final paragraph of Exhibit A of the CSA . This special provision provided that:

> If LEADING EDGE has completed work on tax abatement in

> Wright and Hamilton Counties, Iowa, prior to the term of this
> agreement, and if LEADING EDGE refunds all compensation
> for that work to enXco prior to June 1, 2002, then enXco will
> agree to include that tax abatement work under this agreement
> pursuant to Section 3.

CSA at 4, Defendant's App. at 14. Defendant enXco contends that, under this provision, Leading Edge was required to make a choice, either take the money already paid to it by enXco for tax abatement work on the Wall Lake Wind Farm Project, or refund all money already paid to it by enXco for tax abatement work on the Wall Lake Wind Farm Project by June 1, 2002, in hopes of obtaining a Success Fee and Tax Abatement Commission on the Wall Lake Wind Project pursuant to CSA § 3. Thus, enXco asserts that Leading Edge's repayment of funds paid to it by enXco for tax abatement work on the Wall Lake Wind Farm Project constituted a condition precedent that had to be satisfied by Leading Edge in order to qualify for a possible Success Fee and Tax Abatement Commission on the Wall Lake Wind Project pursuant to CSA § 3. Plaintiff Leading Edge, however, does not construe the special provision as requiring it to make an immediate refund of funds paid to it by enXco for tax abatement work on the Wall Lake Wind Farm Project. Instead, Leading Edge interprets the special provision to only require it to calculate the money paid to it by enXco for tax abatement work on the Wall Lake Wind Farm Project by June 1, 2002, and then to make payment only upon the completion of the Wall Lake Wind Farm Project. In order to gauge these two competing interpretations to the CSA, the court must first review some general principles for construing and interpreting contracts.

## 2. *Applicable contract law*

"'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.'" *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, 959 P.2d 265, 272 (Ca. 1998) (quoting *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal.

1992)); *accord Waller v. Truck Ins. Exchange, Inc.*, 900 P.2d 619, 627 (Cal. 1995). The mutual intention of the contracting parties at the time the contract was formed governs. *Palmer v. Truck Ins. Exchange,* 988 P.2d 568, 572 (Cal. 1999); *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1264 (Cal. 1990). "'Such intent is to be inferred, if possible, solely from the written provisions of the contract.'" *Foster-Gardner, Inc.*, 959 P.2d at 272 (quoting *AIU Ins. Co.*, 799 P.2d at 1264); *see Waller*, 900 P.2d at 627 ("The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it."). "'[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.'" *Powerine Oil Co., Inc. v. Superior Court*, 118 P.3d 589, 598 (Cal. 2005) (quoting *Bank of the West*, 833 P.2d at 552). "'If contractual language is clear and explicit, it governs.'" *Foster-Gardner, Inc.*, 959 P.2d at 272 (quoting *Bank of the West*, 833 P.2d at 552). A contract provision "'will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.'" *Powerine Oil Co., Inc.*, 118 P.3d at 598 (quoting *Waller*, 900 P.2d at 627); *accord Foster-Gardner, Inc.*, 959 P.2d at 272; *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.,* 855 P.2d 1263, 1271 (Cal. 1993). "Furthermore, contractual language is interpreted in its popular and ordinary sense unless the parties expressed a contrary intent." *In re Tobacco Cases I*, 21 Cal. Rptr. 3d 875, 883 (Cal. Dist. Ct. App. 2005); *see American Alternative Ins. Corp. v. Superior Court*, 37 Cal. Rptr. 3d 918, 922-23 (Cal. Dist. Ct. App. 2006) ("We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage."). However, the fact that a term is not defined in the contract does not make it ambiguous. *Powerine Oil Co., Inc.*, 118 P.3d at 598 ; *Bay Cities Paving & Grading, Inc.*, 855 P.2d at 1271. Moreover, "'[c]ourts will

not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.'" *Bay Cities Paving & Grading, Inc.*, 855 P.2d at 1271 (quoting *Reserve Ins. Co. v. Pisciotta*, 640 P.2d 764, 767-68 (Cal. 1982)). With these standards in mind, the court turns to consideration of the contractual provision at issue in this litigation.

### 3. Interpretation of the terms of the CSA

The special provision inserted in the final paragraph of Exhibit A of the CSA provided that:

> If LEADING EDGE has completed work on tax abatement in Wright and Hamilton Counties, Iowa, prior to the term of this agreement, and if LEADING EDGE refunds all compensation for that work to enXco prior to June 1, 2002, then enXco will agree to include that tax abatement work under this agreement pursuant to Section 3.

CSA at 4, Defendant's App. at 14.

The term "refund" is not defined in the CSA. Therefore, the court must interpret that term in its "popular and ordinary" sense. *In re Tobacco Cases I*, 21 Cal. Rptr. 3d at 883. The term is defined in Black's Law Dictionary as: "The return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings." BLACK'S LAW DICTIONARY 1307 (8th ed. 2004). The court finds no ambiguity here regarding the use of this term. Clearly under the special provision in the final paragraph of Exhibit A of the CSA, Leading Edge was given the option of returning all of the compensation it had earned on tax abatement work in Wright and Hamilton Counties by June 1, 2002, in order for that tax abatement work to become eligible for a tax abatement commission pursuant to section 3 of the CSA. Thus, Leading Edge's return of all of the compensation it had earned on tax abatement work in Wright and Hamilton Counties by June 1, 2002, constituted a condition precedent for Leading Edge's tax abatement work in Wright and Hamilton counties to qualify for a possible tax abatement

17

commission. This conclusion is buttressed by the fact that the special provision uses the conjunction "if" twice in describing the qualifying events that needed to occur before using the adverb "then" as a lead to the description of the duty enXco promised to perform. In order to accept Leading Edge's assertion that the refund was due only upon the actualization of tax abatement benefits resulting from the Wall Lake Wind Farm Project, the court would be forced to ignore and in no way consider the words "if" "then" and "prior to" as they appear in the special provision in the final paragraph of Exhibit A of the CSA. To do so would violate one of the general tenants of contract construction that courts must strive to give effect to all the language of a contract. *See National City Police Officers' Assn. v. City of National City*, 105 Cal. Rptr.2d 237, 239 (Cal. Dist. Ct. App. 2001) ("' If possible, the court should give effect to every provision. An interpretation which renders part of the instrument to be surplusage should be avoided.'") (citation omitted)); *City of El Cajon v. El Cajon Police Officers' Ass'n*, 56 Cal. Rptr. 2d 723 (Cal. Dist. Ct. App. 1996) (same); *Harris v. Klure*, 23 Cal. Rptr. 313, 315 (Cal. Dist. Ct. App. 1962) (noting that in construing a contract the court should strive to "give effect to every part thereof if reasonably practicable. . ."); *Lane-Wells Co. v. Schlumberger Well Surveying Corp.*, 150 P.2d 251, 253 (Cal. Dist. Ct. App. 1944) (stating that a contract's construction "must be derived solely from the language within its borders and effect must be given to all parts of the writing.").

Leading Edge also asserts that its return of all of the compensation it had earned on tax abatement work in Wright and Hamilton Counties by June 1, 2002, could not constitute a valid condition precedent for Leading Edge to qualify for a possible tax abatement commission because enXco did not sign the CSA until June 3, 2002. Defendant enXco counters that it was the intent of the parties to have a fully executed contract in place in advance of June 1, 2002 but due to unforseen delays, enXco did not execute the CSA until

June 3, 2002. Defendant enXco argues that due to a mutual mistake by the parties, the parties forgot to change the June 1, 2002, language in Exhibit A to the CSA. Defendant enXco argues that as a result of this mutual mistake, the court should exercise its equitable powers and rescind the final paragraph of Exhibit A to the CSA.

### 4.    *Mutual mistake*

Under California law, "[w]hen through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." CAL. CIV. CODE § 1640; *see Hess v. Ford Motor Co.*, 41 P.3d 46, 52 (Cal. Dist. Ct. App. 2002) (quoting § 1640); *Orcutt v. Ferranini*, 46 Cal. Rptr. 715, 720 n.4 (Cal. Dist. Ct. App. 1965) (same); *People v. D&D Pad Co.*, 340 P.2d 311, 314 (Cal. Dist. Ct. App. 1959) (same); *Security First Nat'l Bank v. Chapman*, 106 P.2d 431, 432 (Cal. Dist. Ct. App. 1940) (same). "To raise mutual mistake as a defense, the aggrieved party does not have to ask 'for a reformation of the contract or' have 'the same reformed.'" *Hess*, 41 P.3d at 52 (quoting *California Packing Corp. v. Larsen*, 203 P. 102, 103 (Cal. 1921)). As the court in Hess noted, "[t]he party need only allege and prove mutual mistake in order to avoid enforcement of the erroneous terms." *Hess*, 41 P.3d at 52; *see also Gillis v. Sun Ins. Office, Ltd.*, 47 Cal. Rptr. 868, 872 (Cal. Dist. Ct. App. 1965).

Section 152 of the Restatement (Second) of Contracts provides in pertinent part:

> (1) Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (1981). Section 154 of the Restatement (Second) of Contracts, in turn, provides:

> A party bears the risk of a mistake when
> (a) the risk is allocated to him by agreement of the parties, or
> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

RESTATEMENT (SECOND) OF CONTRACTS § 154 (1981).

The commentary to Restatement § 152 requires that a party must establish that

> the mistake has a material effect on the agreed exchange of performances. It is not enough for him to prove that he would not have made the contract had it not been for the mistake. He must show that the resulting imbalance in the agreed exchange is so severe that he can not fairly be required to carry it out.

RESTATEMENT (SECOND) OF CONTRACTS § 152 cmt. c. The commentary goes on to explain:

> Ordinarily he will be able to do this by showing that the exchange is not only less desirable to him but is also more advantageous to the other party. Sometimes this is so because the adverse party will give, and the other party will receive, something more than they supposed. Sometimes it is so because the other party will give, and the adversely affected party will receive, something more than they supposed. In such cases the materiality of the effect on the agreed exchange will be determined by the overall impact on both parties.

*Id.*

Thus, under the doctrine of mutual mistake, the mistake must be both mutual and material for a court to grant rescission, and the party seeking recession must not have borne the risk of the mistake. Here, based upon the undisputed evidence of record and after drawing all reasonable inferences in favor of Leading Edge, the court concludes that there was a mutual mistake and the mutual mistake was a basic assumption of the contract that

had a material effect on the agreed exchange of performances. The mutual mistake in this case is based on the timing of Leading Edge's return to enXco of the compensation that enXco had already paid to Leading Edge for the tax abatement work on the Wall Lake Wind Farm Project. The mutuality requirement is satisfied here as both Leading Edge and enXco were aware, through the explicit and unambiguous language of the last paragraph of Exhibit A to the CSA, that reimbursement of the money paid by the date set out in the CSA was a condition precedent for Leading Edge to be eligible for receipt of an abatement success fee. Similarly, the materiality requirement is satisfied here by virtue of the May 3, 2002, email which clearly demonstrates that enXco would not have agreed to permitting Leading Edge to receive an abatement success fee for the work Leading Edge had already completed and been paid for by enXco without a requirement that Leading Edge refund those payments by a date certain in the future. Moreover, the court concludes that enXco has demonstrated that the mistake has a material effect on the agreed exchange of performances in this case since enXco will be exposed to a greater risk of liability than was originally contemplated and negotiated by the parties. Finally, the court notes that the CSA did not assign any risk of mistake to enXco and Leading Edge has offered no cogent reason for assigning the risk to enXco as opposed to Leading Edge. Therefore, the court shall exercise its equitable powers in this case and rescind the final paragraph of Exhibit A to the CSA.[3]

---

[3]The court notes that the CSA has a partial invalidity clause which provides:

> If any term, covenant or condition of this Agreement or application thereof to any person or circumstance shall, to any extent, be declared by a court of competent jurisdiction to be invalid or enforceable, the remainder of the Agreement or application thereof shall not be affected and every term, covenant or condition shall be valid and enforceable to the

(continued…)

With the final paragraph of Exhibit A to the CSA rescinded, Leading Edge has no legal basis upon which to assert an abatement success fee under the CSA for the work it did on the Wall Lake Wind Farm Project. Therefore, defendant enXco's motion for summary judgment is granted and plaintiff Leading Edge's motion for summary judgment is denied.

## III. CONCLUSION

For the reasons discussed above, defendant enXco's motion for summary judgment is **granted** and plaintiff Leading Edge's motion for summary judgement is **denied**. The court concludes that the terms and conditions of the CSA are clear and unambiguous, and that under the terms of the CSA, Leading Edge was required to refund all funds paid to it on the Wall Lake Wind Farm Project as a condition precedent to its possible recovery of an abatement success fee for that project. The court also concludes that the parties made a mutual mistake as to the date certain that Leading Edge was required to make the required refund of money paid to it on the Wall Lake Wind Farm Project. Therefore, the court exercises its equitable powers in this case and rescinds the final paragraph of Exhibit A to the CSA. The court finally concludes that in the absence of the final paragraph of Exhibit A to the CSA, Leading Edge has no legal basis upon which to assert an abatement success fee under the CSA for the work it did on the Wall Lake Wind Farm Project.

**IT IS SO ORDERED.**

---

[3](…continued)
          fullest extent permitted by law.

CSA at 3, Defendant's App. at 13. Therefore, the court's rescission of the final paragraph of Exhibit A to the CSA does not impact the remaining provisions of that agreement.

**DATED** this 21st day of December, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA